FOURNET, Justice.
 

 Nancy Lee Clark • is appealing from a judgment dismissing her suit against her husband, James Moses Clark, for separation from bed and board on the ground of cruel treatment and for .the custody of their four-month old son and granting the defendant a divorce and the custody of the child on the ground of adultery on his re-conventional demand.
 

 In her petition the plaintiff alleged that she and the defendant were married on February 26, 1942, of which union a son, Clarence Dale Clark, was born on January 25, 1943; that the defendant beat, abused, and otherwise treated her cruelly on numerous occasions, specifically on September 1, 1942, while she was in ill health and in a family way, when he struck her, breaking her nose, and otherwise abusing her by .threatening her life with a gun, such abuse resulting in her confinement in bed at her mother’s home for several months, to which place she went the day following the beating; that he rendered no financial assistance during her •confinement and that since the birth of her son she has .taken a professional course and is in a position to secure employment and continue to provide for herself and her son.
 

 In his answer filed on May 24, two days after this suit was instituted, the defendant denied the allegations of plaintiff’s petition, giving in a lengthy, intricate, and exaggerated manner his version of the case and, in a reconventional demand praying for a divorce and the care and custody of the child, he made the broad and general allegation that his wife had committed adultery on numerous occasions, the times, places, and names of the persons then being unknown ,to him but to be produced on the trial of the case, averring further that such acts had been committed in particular with a couple of young men whose given names were unknown to him but whose surnames were Sharp and Carroll. He then specified two instances on which he claims he caught his wife in .the act of adultery, once near the village of Rhinehart with one Boots Culp on June 14, 1942, the other at night in the woods near Pineville on May 14, 1943, with Carroll and Sharp. Some thirty days later he filed a supplemental and amended answer in which he alleged two additional acts of adultery, one, witnessed by him,, at night in a box car near Rhinehart with Carroll, whose first name he then gave as; Otis, the other, not witnessed by him, on
 
 *609
 
 the night of June
 
 10,
 
 1943, on the ground near the trade school dormitory at Pine-ville, with both Otis Carroll and Sharp, whose given name is then designated as Alden.
 

 In his written reasons for judgment the trial judge found that the plaintiff had failed to establish her charges of cruel treatment, for he was of the opinion that her evidence was unsatisfactory in many respects. In this conclusion we concur for, in addition to the countervailing evidence of the defendant’s witnesses, the plaintiff’s own testimony is not only at variance with the allegations of her petition with respect to material facts, but, in many instances, it is in conflict with the testimony of her own witnesses.
 

 But we think the evidence offered by the defendant in support of his accusations against his wife is equally unimpressive. Although he pictured his wife as a most dissolute person, entirely lacking in virtue and totally and completely indifferent as to the places, times, and persons with whom she committed adultery, first in the small community of Rhinehart where they resided and later at the place where she was attending school and subsequently obtained employment, he seemed to be unable to obtain any witnesses to these incidents other than himself and one of his wife’s alleged accomplices, Alden Sharp. Besides, we find that the defendant’s own testimony, like that of the plaintiff, is not only at variance with the allegations of his petition with respect to material facts, but is in conflict with the testimony of this principal witness. Furthermore, we think his’ demeanor and his testimony with respect to his indifferent attitude toward his wife and her alleged accomplices on the occasions when he claims to have witnessed her acts of adultery, taxes mortal credulity, especially when considered together with his professed protestations of solicitude for her welfare and that of the unborn child she was then carrying. It is, to say the least, at variance with ordinary human conduct.
 

 In his testimony supporting his allegations the defendant stated that on June 14, 1942, he caught his wife in the act of adultery with Boots Culp, her first cousin,, in Culp’s home, her uncle at the time being in the field, her aunt washing in the back yard, and two little children playing in the yard, explaining that when he happened to go there to get a cup of coffee he found his wife and Culp in the act of adultery. He testified that some two weeks-later, on June 30, 1942, while he was loading cross ties during the day (not at night as alleged in his reconventional demand) his wife, with Otis Carroll, sought out one-of the box cars along the tracks and there committed adultery in plain view of himself and other people who were working or passing along that way. He stated that on neither of these occasions did he either do or say anything to his wife or her accomplice.
 

 Again, testifying with respect to the alleged act of adultery that occurred orr. May 14, 1943, he told a most incredible story. He said that some time in the fall of 1943, the exact date not being remembered by him, while “hitch-hiking” to his.
 
 *611
 
 borne in Rhinehart from his job in Texas, he was dropped near the place where Carroll’s truck happened to be parked and .that he happened to find Carroll sitting in ■the truck and his wife committing adultery with Sharp some fifty yards away in plain view. Contrary to his allegation that this incident also occurred on the night of May 14, 1943, he testified it was in the fall of 1943 and in the day. Furthermore, he would have us believe that he not only did nor said nothing to his wife and Sharp at .the time but that he waited patiently until they had completed the act and until ■Sharp and Carroll had taken his wife back to Pineville so that he might ride home with these men.
 

 The trial judge .seemed to be impressed with the fact that the plaintiff, while on the stand, failed' .to deny categorically the charges brought against her by her husband. Of course her failure to answer these allegations, particularly when she was never interrogated with respect to them, did not relieve the defendant of his burden of proving .them. We likewise do not attach the weight, as did the trial judge, to the fact that the plaintiff, •on August 22, 1942, signed an answer admitting the allegations of her husband’s petition (signed but never filed) with respect to her act of adultery with Culp on June 14, 1942, for the record strongly indicates this was a consent proceeding. Both .the petition and answer were prepared by the defendant’s attorney and were signed by both the plaintiff and defendant at the same time. Furthermore, even if the plaintiff was guilty, we think the evidence is most convincing that the defendant condoned this particular ac.t thereafter.
 

 In an apparent effort to avoid .the consequences of this condonation of his wife’s alleged adultery with Culp on June 14, 1942, and to have his version thereof corroborated by his. sister and brother-in-law, who lived next door to him, the defendant denied that he ever lived with his wife after June 14, 1942, or that he even knew of her whereabouts except in a general way from that day until he took her to* her mother’s home on September 2, 1942, stating most positively that she was living in and around the little village of Rhinehart (a small station stop on the Louisiana & Arkansas Railway having an accredited population of exactly 35 persons according to the 1944 edition of Rand Mc-Nally’s Commercial Atlas and Marketing Guide) although he could not state exactly with whom she was living in the small settlement. This is not only at variance with the pleadings prepared and sworn to by ■ him in August of 1942, where he specifically alleged she continued to live in Culp’s home in open adultery after he caught .them together on June 14, 1942, but is also at variance with similar allegations in his reconventional demand filed on May 24, 1943, and with his admitted treatment •of her during that period. Although giving his discovery of his wife’s pregnancy as his reason for not filing the pleadings prepared in August of 1942, we find in his testimony .the statement that he personally and repeatedly took her to the doctor with reference to her condition. He is corroborated in this respect by the physi
 
 *613
 
 cian to whom he took his wife for examination in her early pregnancy.
 

 Again we find that although claiming he was separated from his wife from the time of the Culp incident, the defendant stated that when he learned, just before taking the plaintiff to her mother on September 2, 1942, that she had injured herself in an effort to bring about a premature delivery of her child, he borrowed his brother-in-law’s car and, taking his sister, brother-in-law, and the plaintiff, picking up her mother on the way, he entered her in the hospital in Pineville, where he remained with her for several days until her discharge. He then .took her home by bus and from there to her mother’s on September 2, 1942, in a car rented by him for that specific purpose. He also volunteered the information that when he took her to her mother’s, her clothes were still at his home, although she had allegedly lived with Culp from June 14 until that time. In addition, we find that after much insistence on his part, the sheriff consented to go with him to her mother’s three days later with the view of prevailing upon her to return to him.
 

 In considering Sharp’s testimony we need only to say that while a corespondent is not disqualified by law from testifying with reference to his intimacies with the erring spouse, the statements made by him must be corroborated and weighed with great caution before being accepted as true (Mouille v. Schutten, 190 La. 841, 183 So. 191) and point out that Sharp’s' testimony is not only not corroborated in some material facts but that from the record as made up a strong impression is created that .there was collusion between this witness and the defendant, admittedly an intimate friend of his, although the defendant in his testimony endeavored to imply he only knew Sharp slightly. In addition, Sharp’s testimony is contradicated by the defendant in many instances and is otherwise discredited.
 

 We are of the opinion that the defendant has failed to prove his case by competent evidence within that reasonable legal certainty required by law and we also .think that the interest of all parties will best be served by dismissing both of these suits.
 

 For the reasons assigned, the judgment of the lower court, .in so far as it grants the defendant a divorce against his wife and the care, custody, and control of their minor son, Clarence Dale Clark, is annulled and set aside and his reconventional demand is dismissed. In all other respects it is affirmed.
 

 The court, availing itself of the authority granted in Act No. 229 of 1910, taxes all of the costs of these proceedings against the defendant.
 

 HIGGINS and HAWTHORNE, JJ., do not take part.